UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

AYMAN NABIL GHALY,

                    Plaintiff,

    -against-

U.S. DEPARTMENT OF AGRICULTURE,
MIKE JOHANNS, Secretary of Agriculture,

                  Defendants.

------------------------------------------------------------x

**MEMORANDUM AND ORDER**

06-CV-3744 (ENV)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 16 2010 ★

BROOKLYN OFFICE

**VITALIANO, D.J.**

    Ayman Nabil Ghaly ("Ghaly" or "plaintiff"), proceeding pro se, brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), against the United States Department of Agriculture ("USDA"), his former employer, and Mike Johanns, the Secretary of Agriculture, alleging that he was discriminated against and subjected to a hostile work environment based on his race and national origin and retaliated against for complaining about these allegedly wrongful employment practices. Plaintiff seeks to recover income lost due to inability to work overtime, punitive damages, and attorneys' fees. Defendants have moved for dismissal pursuant to Rule 37 of the Federal Rules of Civil Procedure due to plaintiff's disregard of discovery obligations, or in the alternative, summary judgment dismissing his claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated below, defendants' Rule 37 motion is denied; their Rule 56 motion for summary judgment is granted.

## BACKGROUND

    The following facts are drawn from the complaint and the submissions of the parties on defendants' motion, including defendants' statement of undisputed material facts made pursuant

to Local Civil Rule 56.1.[1]  The facts are construed, as they must be in the summary judgment context, in the light most favorable to the nonmoving party.  See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc., 473 F.3d 450, 456 (2d Cir. 2007).  Any relevant factual disputes are noted.

In September 1996, Ghaly began working for the Animal Plant Health Inspection Service ("APHIS"), a federal agency that was then under the aegis of the USDA.  Operational control of APHIS has since been transferred to the Department of Homeland Security ("DHS").  Ghaly started with APHIS as a Plant Protection and Quarantine ("PPQ") technician at John F. Kennedy International Airport in Queens.  In this position, with a salary grade level of GS-5, Ghaly's responsibilities were to support PPQ officers and conduct routine tasks associated with inspection activities.  (See Cunha Decl., Ex. A at 80).[2]  PPQ officers, on the other hand, held a grade level of GS-11, and provided guidance to and coordinated the work of technicians.  (Id.)

Ghaly, who identifies himself as Christian of Egyptian national origin, claims he was discriminated against at the USDA "via racial remark" by a superior on June 6, 1999.  (Cunha Decl., Ex. D).  Specifically, Ghaly alleges that, during his shift that day, he and some other personnel needed to destroy contraband, but the grinder they regularly used was broken, so Ghaly proposed using the compactor/incinerator instead.  A senior PPQ officer agreed, and a few employees, including Ghaly, started moving the contraband.  While they were moving it, another senior PPQ officer, Michael Greenberg, told Ghaly: "Contraband has been disappearing from the compactor, and if you refuse to grind the contraband, I will write you up."  (Cunha Decl., Ex. A

---

[1] Although defendants complied with Local Rule 56.2 (Notice to Pro Se Litigant who Opposes Summary Judgment), Ghaly has not provided any affidavits or other evidence to controvert the undisputed facts set forth in Defendants' Local Civil Rule 56.1 Statement.  Therefore, the Court deems admitted, where supported by evidence, the facts set forth in the 56.1 Statement.  See Giannulo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) (uncontroverted facts in a Rule 56.1 statement will be deemed admitted where supported by evidence).

[2] References to "Cunha Decl." denote the declaration of Zachary A. Cunha in support of defendants' motion for summary judgment.

at 11). In a letter Ghaly wrote the next day to an agency official, he claimed that Greenberg then approached another officer on duty, Ram Challa, who was dark-skinned, and said, "Go help your brother."[3] (Id.) Ghaly asked Greenberg what he meant by that statement, and Greenberg did not answer. Approximately 10 minutes later, Ghaly heard Greenberg say, "I don't care. I don't give a F," which Ghaly believes was in response to other officers who were telling him to apologize. (Cunha Decl, Ex I at 27).

In his complaint letter following the June 6, 1999 incident, Ghaly wrote that Greenberg "acted poorly and with complete disrespect to a fellow employee," and claimed that Greenberg was obviously retaliating against him because the two men were in a dispute over an "email incident." (Cunha Decl., Ex. A at 11). Greenberg, through his lawyer, responded to Ghaly's letter, denying that he made the allegedly offensive statement; the letter claimed instead that Greenberg had simply asked Ghaly to comply with regulations. However, Ghaly alleges that Greenberg was "looking down" on him and Challa as minorities. (Cunha Decl., Ex. I at 29). Greenberg was never accused by anyone else of making discriminatory or offensive comments, either before or after this incident. (See 56.1 ¶ 10).[4]

Starting in or about August 1998, Ghaly began sending letters to his employer, local union, United States Senators, the ACLU, and others, complaining that PPQ technicians did not have access to overtime. He states in the complaint that he was not a "low profile employee." (Cunha Decl., Ex D). Sometime in late 1999 or early 2000, the Office of the Inspector General ("OIG") began an investigation into time and attendance improprieties at JFK. According to

---

[3] Ghaly's version of this incident varies somewhat in his initial complaint letter and his deposition testimony, taken nearly seven years after the incident. At his deposition, Ghaly testified that Greenberg had made the "brother" statement to him, not to Challa, because Ghaly was "lower in rank." (Cunha Decl, Ex. I at 26). The variance is immaterial.

[4] References to "56.1" denote defendants' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1.

Ghaly, he prompted this investigation by reporting officers and union officials who engaged in falsifying records, and had gone to an official's "retirement party on government time and money off airport property to go drink alcohol beverages and come back." (Cunha Decl., Ex. I at 45).

In the course of its APHIS investigation, OIG subpoenaed employee parking records, including those of Ghaly. According to an initial fact-finding report dated May 1, 2000, Ghaly's records revealed numerous and frequent attendance abuses, but did not show that he had partaken in the overtime abuse that appeared to be prevalent among PPQ officers. The report attributed this to the fact that PPQ technicians were only entitled to work overtime on Sunday and holidays. Ghaly was the only technician implicated in the investigation.

On September 12, 2000, Michael Wright, who was then the state director for the PPQ group, issued Ghaly a letter proposal for removal from his position. The proposal specified 79 incidents where Ghaly's time sheet did not match his parking records. Ghaly was placed on administrative leave with pay and instructions to stay by his phone on weekdays from the hours of 8:00 AM to 4:00 PM, pending the completion of his removal proceedings. Through his attorney, Ghaly provided written responses to the agency's allegations. An oral conference was held on November 2, 2000, at which Ghaly insisted that he had only left the work area when given permission by a supervisor. After reviewing the record and Ghaly's submissions, the Oral Conference Officer determined that the evidence of misconduct on Ghaly's part was scanty, and recommended that the agency issue him a letter of caution.

In connection with the same OIG investigation, approximately nine other APHIS employees, all officers, were also placed on paid, nonduty status. Of these officers, two were Caucasian of unspecified religious persuasion, one was Muslim of Nigerian national origin, one

was Muslim of Egyptian national origin and three were individuals of unspecified religious persuasion, Hispanic ethnicity, and Puerto Rican national origin. (See 56.1 ¶ 27). According to Ghaly, the agency targeted all the "heavy-hitters" – i.e., the employees who worked overtime and, in Ghaly's case, complained about overtime, the most. (Cunha Decl, Ex. I at 48.) At his deposition, Ghaly testified that the agency subjected them to "economic discrimination." (Id. at 61). He asserts that the agency acted in bad faith because (a) it placed the employees on leave before asking them to explain the discrepancies in their records and (b) it conspired to take away their overtime, force them to hire lawyers, and place them in a financially difficult situation.

On October 19, 2000, while Ghaly was on leave from APHIS, he filed a suit in the United States District Court for the Southern District of New York against the agency seeking reinstatement from administrative leave. See No. 00-cv-7991 (S.D.N.Y.). In that complaint, Ghaly purportedly "brought examples of how the agency was practicing a cover up." (Id. at 44). Specifically, he claimed there were eight different occasions where management had been present at hall meetings with the employees under investigation, meaning that the employees were legitimately absent from their stations, but OIG cited these times as unexplained absences in their proposals for removal. According to Ghaly, this was evidence of a "conspiracy to eliminate employees."

On October 17, 2001, the agency issued Ghaly a letter of caution, and he was allowed to return to work. He received his full base salary for the entire 13 months that he was on leave. (See 56.1, ¶ ¶ 22-23). The other employees who were placed on leave were either fired or given a suspension ranging from 10 to 14 days.[5] (See 56.1, ¶ ¶ 30, 32).

---

[5] According to plaintiff, the fired officers were reinstated after bringing their case to the U.S. Merit Systems Protection Board ("MSPB").

Upon Ghaly's return, he bid, based on seniority, to work at JFK Terminal 1.  He received his chosen assignment, and worked there for about two months.  However, he was then transferred to the cargo area at Wright's direction.  In a sworn affidavit submitted by defendants, Wright states that the decision to transfer Ghaly was based solely on concerns regarding his attendance.  The decision was driven by the determination, ultimately by Wright, that Ghaly should be placed under direct supervision, and his assignment at Terminal 1 left him unsupervised for a substantial portion of his shift.  Of the other employees put on leave as a result of the OIG investigation, only one other employee was placed under direct supervision after returning to work.  (See 56.1 ¶ 39).

Ghaly, on the other hand, contends that the transfer to cargo was an attempt to frustrate him into quitting.  He also maintains that it was in violation of a collective bargaining agreement, which required that management negotiate with employees before changing their assignments.  Ghaly's pay did not decrease as a result of the transfer to the cargo area, but he lost the ability to make night differential pay (an extra $1.60 per hour worked after 6:00 PM) because his shift changed from the afternoon to the morning.  He also alleges that he was deprived of sick leave, because he had to go through extensive dental surgery during that period and could no longer go to appointments during non-work hours.  Further, Ghaly claims that he was not given anything to do upon his arrival at cargo, but merely sat watching airplanes and reading books.  After a month or so, his supervisor trained him to do computer data entry and assigned him to prepare paperwork for supervisors.  Ghaly asserts that he "got shoved" into these responsibilities because there was nothing else for him to do, and suggests that the assignments fostered "animosity" because he was handling "everyone's money and time."  (Id. at 93).

Ghaly also claims that, in late 2001, he was subjected to a hostile work environment in the cargo area due to his national origin. In particular, he alleges that he was offended by a posted clipping that showed four terrorists responsible for 9/11, on which, someone had written, "Sorry, Suma" (presumably referring to an Egyptian Muslim female officer named Suma, who wore a veil to cover her hair). (Cunha Decl., Ex. I at 114). Ultimately, Ghaly ripped the offending poster off the wall. According to Ghaly, on other occasions, his co-workers posted pictures of Osama Bin Laden with bull's-eyes drawn over his face or comments such as "go eat shit" or "die" written on them, and jokingly compared Ghaly to the 9/11 terrorists by making comments such as "you people are tribal people" and "you're a bunch of terrorists, all of you Arabs." (Id. at 121). However, he acknowledges that, once he warned these co-workers to stop making jokes, they did so immediately.

At some point in 2002 or 2003, Ghaly began complaining to management that the posters and clippings were inappropriate and violated the will of Congress.[6] The first response he received was that the posters could stay up because they relieved stress. However, eventually management directed that they be taken down. Ghaly testified that when he saw the posters were still up, he began to take pictures of them. The following day, he received an email sent to all the employees that stated he was not allowed to take photographs at work. Ghaly then brought the port director, George Jelinek, to the room where the Bin Laden bull's-eye picture was up and showed it to him, asking why the picture was there. At that point, PPQ Officer Paul Gunther got up, stated that the president had ordered Bin Laden's execution, and asked Ghaly: "What are you, a radical Muslim?" (Id. at 124). Gunther was never reprimanded or punished, which Ghaly attributes to the fact that Gunther is white. (Id. at 125).

---

[6] Ghaly claims Congress issued a rule stating that governmental agencies could not hang posters regarding Osama Bin Laden or provoke issues with Middle Eastern employees in general.

Ghaly testified that he continued to have problems with different officers after the comment, especially Gunther and two others, whom he dubbed the "white racist trio." (Id. at 126). Ghaly recalled that the problems escalated to the point where he needed to turn to alternative dispute resolution. According to Ghaly, the officers were counseled over the phone to leave him alone and stop putting posters up. (Id.) At some point, he told a supervisor that he was going to the United States Attorney because the situation was turning into a hate crime. The supervisor then called a meeting and informed all employees that only pictures of family and friends could be displayed at work. Ghaly claims the "trio" was upset that they had to change their behavior due to his complaints. He also alleges he was harassed by the trio and other officers. Examples of this harassment included incidents when an officer, who was not his supervisor, tried to send him home from an overtime shift or when officers monitored him and singled him out for taking coffee breaks, despite the fact that everyone took coffee breaks.

Notwithstanding Ghaly's complaints about working in the cargo area, when the time came for him to bid again, he chose to remain there. He claims that he did so out of spite and "to see if management felt like moving [him] again." (Id. at 107). Management did not move him, and he received an outstanding evaluation for his work at cargo. He remained there until he was transferred to California at his own request. He continued working for APHIS until he quit in 2006, returned to New York, and started a private business.

During his time with APHIS at JFK, Ghaly filed three complaints with the EEOC. The first, filed on January 29, 2000, alleged that he was subjected to discrimination based on national origin (Egypt), race (black) and reprisal (for past EEO activity) when Officer Greenberg questioned him about his improper use of government equipment and made the above-described comment regarding his "brother." Ghaly's second EEOC complaint, filed on January 3, 2001,

8

alleged that he was subjected to discrimination based on national origin and reprisal when the agency placed him on administrative leave in late 2000. The third and last complaint, filed on May 1, 2002, alleged that he was subject to discrimination based on national origin and reprisal when the agency assigned him to a terminal not of his choosing, changed his shift, and placed him under constant supervision. Ghaly did not file an EEOC complaint regarding the Bin Laden posters or the "radical Moslem" comment made by Officer Gunther. (See 56.1, ¶ 45).

Ghaly's three EEOC complaints were consolidated, and the EEOC conducted an investigation into his allegations. At the conclusion of the investigation, Ghaly received a copy of the investigative report and requested a hearing before an EEOC Administrative Judge ("AJ"). On November 13, 2003, the AJ issued a notice of intent to issue a decision without a hearing, and, on March 12, 2004, the AJ did just that, finding that there was no discrimination. The AJ concluded that Ghaly failed to establish a prima facie case of discrimination with respect to his first complaint, noting, *inter alia*, that Ghaly had been previously warned about his inappropriate behavior and had a history of misusing government equipment and making inflammatory and harassing comments to fellow employees. As to Ghaly's second complaint, the AJ found that the decision to place him on leave was based on allegations of falsification of time and attendance records, and concluded there was no evidence of discrimination. As for the last complaint, the AJ found that Ghaly was the only one out of ten employees who was provided closer supervision after return from administrative leave, but noted that the position description for PPQ technicians required supervision by PPQ officers. Accordingly, he discerned no inference of bias and concluded there was no discrimination.

Ghaly appealed, and the EEOC affirmed the AJ's decision on February 7, 2006. Analyzing the events at issue in Ghaly's first EEOC complaint, the commission held that the

incidents, taken together, were not sufficiently severe or pervasive to constitute discriminatory harassment. As to the second complaint, the commission also found that the agency articulated a legitimate, nondiscriminatory reason for its decision to place Ghaly on leave. It also found Ghaly had presented no evidence of pretext. For the third and final complaint, the commission found the agency had articulated a legitimate, nondiscriminatory reason for transferring him to cargo, specifically citing concerns about tardiness and other attendance problems, and also found that Ghaly failed to present evidence that the reason offered was a pretext for discrimination.

On April 18, 2006, Ghaly commenced the instant action by filing a complaint in the United States District Court for the Southern District of California, naming the USDA, APHIS, and Secretary of Agriculture as defendants, and alleging claims for "(1) discrimination; (2) retaliation; and (3) harassment." (Cunha Decl., Ex. A at 1). On May 30, 2007, defendants moved to dismiss the complaint, or in the alternative, transfer it to the Eastern District of New York. On July 28, 2007, the action was transferred to this Court, which directed Ghaly to file an amended complaint because his original complaint consisted of three words and a number of papers relating to his prior EEOC proceedings. Ghaly duly amended his complaint on October 30, 2006 and asserted three causes of action against the USDA and the Secretary of Agriculture: (1)"discrimination via racial remark," referring to the incident with Officer Greenberg; (2) "harassment via ongoing hostile work environment . . . due to the fact that [he] fought for [t]echnician employee rights," which worsened after 9/11 when Gunther allegedly made his "radical Moslem" remark; and (3) retaliation by management by removing him from work for 13 months and transferring him to the cargo worksite with no duties to carry out in the hope that he would quit and walk away. (Cunha Decl., Ex. D).

Defendants answered Ghaly's amended complaint on November 20, 2006. The Court set a discovery schedule, under which discovery was to conclude by February 9, 2007. Defendants sent a number of interrogatories and requests for production of documents to Ghaly on December 28, 2006. Ghaly did not respond to these requests. Defendants, on February 7, 2007, requested that the Court compel Ghaly to respond. On February 13, 2007, Magistrate Judge Lois Bloom gave Ghaly notice that if he failed to respond to defendants' written discovery requests, or if he did not complete his deposition prior to March 9, 2007, she would recommend that the action be dismissed with prejudice. Ghaly filed for a further extension of discovery on March 8, 2007, in response to which Judge Bloom ordered the deadline extended to April 6, 2007, to respond and further ordered that no further extension requests would be entertained. Ghaly's deposition was taken on April 10, 2007. In lieu of responding to defendants' written discovery requests. Ghaly submitted a short statement in which he argued that he was unable to comply because he had been "instructed by the court not to contact management for a written statement." (Docket No. 39). He also asserted that "fellow coworkers . . . could not willingly come forth and provide a statement" owing to a concern that doing so would violate an unspecified written agreement. (Id.) Lastly, he stated that some witnesses would not come forth because they feared retribution, and would not testify without a court order compelling them to do so.

## RULE 37 SANCTIONS MOTION

Empowered by Rule 37, district courts have broad discretion in imposing sanctions to compel compliance with discovery orders, including the "extreme sanction of dismissal." See NHL v. Metro. Hockey Club, Inc., 427 U.S. 639, 643, 96 S. Ct. 2778, 2781 (1976) (per curiam). "[D]ismissal with prejudice is a harsh remedy to be used only in extreme situations . . . and then only when the court finds willfulness, bad faith, or any fault on the part of the [of a party]." See

Bobal v. Rensselaer Polytechnic Inst., 916 F.2d 759, 764 (2d Cir. 1990). Reasonable minds might, then, disagree as to remedy, but there is no disagreement that "all litigants, including pro ses, have an obligation to comply with court orders." Minotti v. Lensink, 895 F.2d 100, 103 (2d Cir. 1990) (internal quotation marks omitted). Accordingly, the sanction of dismissal with prejudice may be imposed on a pro se litigant if he was warned that noncompliance with a discovery order could result in dismissal. See Bobal, 916 F.2d at 766.

Within the considered bounds of discretion, the Court does not find that Ghaly's conduct during discovery in this case warrants dismissal of his claims against defendants. Ghaly ultimately heeded Magistrate Judge Bloom's order to appear for his deposition, and although he did not respond to the discovery requests as ordered, he made an effort to explain that he believed himself incapable of responding, thereby evincing a lack of "bad faith." Furthermore, Ghaly's conduct appears not to have amounted to the sort of tactical litigation delays or other misconduct for which the sanction of dismissal has customarily been deemed appropriate. See, e.g., Friends of Animals Inc. v. U.S. Surgical Corp ., 131 F.3d 332, 333-34 (2d Cir. 1994) (upholding dismissal after magistrate judge warned plaintiff on five occasions about the possibility of the drastic sanction of dismissal, and there were 650 entries in the docket relating to discovery disputes and tactical delays of litigation); John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 845 F.2d 1172, 1176 (2d Cir. 1998) (affirming court's grant of sanctions after plaintiff delayed discovery for three years and was warned twice about the possibility of the sanctions of dismissal of the complaint). Accordingly, the Court declines to impose the harsh sanction of dismissal with prejudice in this case for plaintiff's discovery peccadillos.

# SUMMARY JUDGMENT

## A. Standard of Review

The Court's responsibility in assessing the merits of a summary judgment motion is not to try issues of fact, but rather to "determine whether there <u>are</u> issues of fact to be tried." Sutera v. Schering Corp., 73 F.3d 13, 16 (2d Cir. 1995) (internal quotation marks omitted) (emphasis in original). The moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, <u>see, e.g.</u>, Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005), and the Court will resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion. <u>See, e.g.</u>, Sec. Ins. Co. of Hartford v. Old Dominion Freight Line. Inc., 391 F.3d 77, 83 (2d Cir. 2004); Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 33 (2d Cir. 1997) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.").

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party. <u>See</u> Fed. R. Civ. P. 56(e). The nonmoving party may not rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmoving party must "make a showing sufficient to establish the existence of [each] element to that party's case . . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986). If the evidence favoring the nonmoving party is "merely colorable, or is not significantly probative,

summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511 (1986) (internal citations omitted).

The Second Circuit has often cautioned that courts should be "chary" in granting summary judgment in employment discrimination cases, where intent of the employer is usually a central factual issue. See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 71 (2d Cir. 2000) (citing Chertkova v. Conn. Gen. Life Ins., 92 F.3d 81, 87 (2d Cir. 1996)); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997). "[E]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law." Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999). Notwithstanding, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v. Delta Air Lines, 239 F.3d 456, 466 (2d Cir. 2001). "[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." Schwapp, 118 F. 3d at 110; see also Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994) ("[S]ummary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact.")).

Finally, when, as here, a party is proceeding pro se, a court must read that party's supporting papers "liberally . . . and interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1998); accord Soto v. Walker, 44 F.3d 169 (2d Cir. 1995).

## B. Plaintiff's Title VII Claims

Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a), or to retaliate against any employee who complains about a Title VII violation. See id. § 2000e-3(a). In a Title VII action, the plaintiff always bears the ultimate burden of proof to show that the employer's motivation was discriminatory or retaliatory. See Norton, 145 F.3d at 118-19.

Plaintiff alleges that defendants engaged in discrimination against him based on his race and national origin, subjected him to a hostile work environment, and retaliated against him because of EEO activity. As a threshold matter, it is black-letter law that the only proper defendant in a Title VII action by an employee or prospective employee of the federal government is the "head of the department, agency, or unit, as appropriate," not the agency itself or any lower level employees. 42 U.S.C. §2000e-16(c); see also Healy v. United States, 677 F. Supp. 1284, 1287 (E.D.N.Y. 1987). Therefore, the only proper defendant in this case is the Secretary of Agriculture, and plaintiff's claims against the USDA are dismissed with prejudice.

1. "Discrimination via Racial Remark"

Plaintiff first complains of unlawful discrimination "via racial remark;" namely, the June 6, 1999 comment by supervisor Greenberg that plaintiff should help his "brother," which comment was one of the subjects of plaintiff's first EEOC complaint. Plaintiff interprets this rather ambiguous remark as an allusion to the fact that he and the other employee it addressed are both of dark complexion. Without more, however, "[s]tray racial remarks or slurs are not actionable under Title VII." Badrinauth v. Touro College, No. 97-cv-3554, 1999 WL 1288956, at *4, (E.D.N.Y. Nov. 4, 1999). The inquiry does not end there, though, since the Court liberally construes this cause of action as a claim that the allegedly racist remark created or contributed to a "hostile work environment" in violation of Title VII; such a proscribed environment exists

where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct 367, 370 (1993) (internal quotation marks omitted).

Title VII hostile work environment claims are subject to "demanding standard[s]" in order to avoid construing the statute as a "general civility code." Wilson v. N.Y.P. Holdings, Inc., No. 05-CV-10355, 2009 WL 873206, at *27 (S.D.N.Y. Mar. 31, 2009). To make out a hostile work environment claim under Title VII, a plaintiff must show both: "(1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)). To defeat a motion for summary judgment on a Title VII hostile work environment claim, "[a] plaintiff must produce evidence that could lead a reasonable jury to conclude that 'the work environment both objectively was, and subjectively was perceived by the plaintiff to be, sufficiently hostile to alter the conditions of employment for the worse.'" Divers v. Metro. Jewish Health Sys., No. 06-CV-6704, 2009 WL 103703, at *15 (E.D.N.Y. Jan. 14, 2009) (quoting Schiano v. Quality Payroll Sys., 445 F.3d 597, 604 (2d Cir. 2006)).

"Courts look at all circumstances to ascertain whether an environment is sufficiently hostile or abusive to support a claim." Leibovitz v. N.Y. City Transit Auth., 252 F.3d 179, 188 (2d Cir. 1998) (citations omitted). "The factors that courts may consider include: frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance." Id. at 188 (citation omitted). As a general matter, "[f]or racial comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that [i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments. Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment." Schwapp, 118 F.3d at 110-11 (internal quotation marks and citations omitted) (alteration in original). However, the Second Circuit has also emphasized that "a single act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's workplace." Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004) (internal quotation marks and citations omitted) (alteration in original). "In short, a plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." Alfano, 294 F.3d at 374 (internal quotation marks and citations omitted).

The Court finds that the "go help your brother" comment allegedly made by Greenberg is insufficient alone to support a Title VII hostile work environment claim. Assuming the accuracy of plaintiff's interpretation of the comment as a derogatory reference to the color of his skin, the comment was understandably offensive. But there is no indication that Greenberg's behavior on June 6, 1999 single-handedly effected a negative change, or any change at all, in the conditions of plaintiff's working environment. Plus, alternatively, there is no allegation that plaintiff, at or around the same time, dealt with any other, much less dealt with a steady barrage of, similar comments from Greenberg or anyone else at APHIS. See, e.g., Hawana v. City of New York, 230 F. Supp. 2d 518, 533 (S.D.N.Y. 2002) (single comment to Egyptian plaintiff by supervisor to

the effect that he came from a third world country and therefore did not like women was "woefully insufficient to rise to the level of harassment required to overcome a motion for summary judgment" on plaintiff's hostile work environment claim). Accordingly, to the extent that plaintiff has raised a hostile work environment claim based on Greenberg's "brother" comment, that claim is dismissed with prejudice.

2. Post-9/11 Hostile Work Environment

Plaintiff's second cause of action is identified in the complaint as a claim for a hostile work environment arising from plaintiff's vocal efforts to advance "[t]echnician employee rights," and escalating after 9/11 with Officer Gunther's "what are you, a radical Moslem?" remark. Additionally, at his deposition in this action, plaintiff alleged other post-9/11 instances of discriminatory conduct and comments by superiors and colleagues related to plaintiff's Egyptian national origin, as described supra. However, unlike the "brother" comment allegedly made by Officer Greenberg in 1999, plaintiff did not raise these allegations in any of his three EEOC complaints, and he is now time-barred from filing another EEOC charge regarding them.[7] Exhaustion of administrative remedies "is a pre-condition to bringing a Title VII claim in federal court." Chandler v. AMR Am. Eagle Airlines, 251 F. Supp. 2d 1173, 1178 (E.D.N.Y. 2003) (quoting Francis v. City of New York, 235 F.3d 763, 768 (2d Cir. 2000)). "A Title VII plaintiff typically may raise only those claims that are either contained in a prior EEOC charge or are 'reasonably related'" to allegations raised therein." Chandler, 251 F. Supp. 2d at 1178 (quoting Holtz v. Rockefeller & Co., 258 F.3d 82-83 (2d Cir. 2001)).

---

[7] Under EEOC regulations, a claimant who believes he has been discriminated against must consult a counselor at the agency's EEO office within 45 days of the alleged discriminatory act. 29 C.F.R. § 1614.105(a)(1). If the matter is not resolved after a mandatory counseling period, the employee may then file a formal written administrative complaint with the EEOC, within 15 days of the EEO counsel's final interview with the employee. 29 C.F.R § 1614.106(a) and (b). The employee may then file a civil action (i) within 90 days of notice of a final agency decision on his or her EEOC complaint, or (ii) after 180 days from the filing of the EEOC complaint if the agency has not yet rendered a decision. See 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.408 (a), (b).

The Second Circuit has recognized three situations in which a plaintiff may assert in district court a claim that was not specifically pleaded in an EEOC complaint because it is "reasonably related" to the claims in the EEOC complaint: (1) claims within the scope of the EEOC investigation likely to result from the EEOC complaint; (2) claims of retaliation for filing the EEOC complaint; and (3) further incidents that occur after the filing of the EEOC charge that are carried out in precisely the same manner alleged in the EEOC charge. See Butts v. N.Y. Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1402-03 (2d Cir. 1993); see also Williams v. N.Y. City Hous. Auth., 458 F.3d 67, 70 n.1 (2d Cir. 2006). When determining whether claims are reasonably related, the focus should be "on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which plaintiff is grieving." Deravin v. Kerik, 335 F.3d 195, 201 (2d Cir. 2003) (quoting Freeman v. Oakland Unified Sch. Dist., 291 F.3d 632, 637 (9th Cir. 2002)). "[I]t is the substance of the charge and not its label that controls." Deravin, 335 F.3d at 201 (quoting Alonzo v. Chase Manhattan Bank, N.A., 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998)), and both pre-charge and post-charge conduct may be reasonably related. See Francis v. City of New York, 235 F.3d 763, 766 & n.1 (2d Cir. 2000). The central question is whether the charge filed with the EEOC gave the agency "adequate notice to investigate discrimination on both bases." Williams, 458 F.3d at 70.

Ghaly's first two EEOC complaints were filed well before the terrorist attacks of 9/11. The initial charge specifically complained that, on one day in 1999, Officer Greenberg had disciplined Ghaly unfairly and had made a discriminatory remark to him pertaining to the color of his skin. The second and third charges complained that specific adverse employment actions were taken against plaintiff on a discriminatory basis: his placement on administrative leave in late 2000, and his transfer from his preferred terminal at JFK to the cargo area in early 2002.

The AJ's decision dismissing these charges and the EEOC's affirmance of that decision were both silent about any post-9/11 hostile work environment claim. The Court finds that the allegations underlying Ghaly's post-9/11 hostile work environment claim – *inter alia*, his allegations regarding Officer Gunther's "radical Moslem" comment and his coworkers' posting and defacing of Osama Bin Laden posters in 2002 and 2003 – were not within the scope of the EEOC's investigations of his administrative complaints. See, e.g., Chandler, 251 F. Supp. 2d at 1186 (as more than year had passed between alleged incidents, they were not sufficiently related to support a single hostile work environment claim). Nor was the alleged post-9/11 verbal harassment carried out in precisely the same manner as the discrimination claimed in his EEOC complaints, which implicated different personnel and primarily protested discrete employment actions, as opposed to a cumulatively hostile atmosphere. Finally, Ghaly alleges that he became a lightning rod for hostility after 9/11 because of his Egyptian national origin, particularly so because APHIS management already had it out for him due to his campaign for advancement of the labor rights and interests of PPQ technicians; however, Ghaly provides absolutely no basis for a reasonable inference that the post-9/11 hostile conduct he complains of constituted retaliation for the filing of his prior EEOC discrimination complaints.

As there is no theory by which Ghaly's post-9/11 hostile work environment claim could be deemed "reasonably related" to his prior EEOC complaints, see Butts, 990 F.2d at 1402-03 (2d Cir. 1993), the claim is barred by his failure to exhaust administrative remedies, and consequently, is dismissed with prejudice.

3. Retaliation

Plaintiff's last claim in this case alleges retaliation as a result of his placement on paid, non-duty status for 13 months in 2000 and then, upon his return to work in 2001, his transfer to

what he viewed as an undesirable duty post in the cargo area. With respect to such retaliation claims, Title VII provides that "[i]t shall be unlawful . . . for an employer to discriminate against any of his employees ... because he has opposed any practice made unlawful by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

Courts evaluate Title VII retaliation claims using the McDonnell Douglas three-step burden-shifting analysis. See generally McDonnell Douglas v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824 (1973). First, a plaintiff must establish a prima facie case showing: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." McMenemy v. City of Rochester, 241 F.3d 279, 282-83 (2d Cir. 2001); see Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996). In determining whether this initial burden has been satisfied, a district court's role is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive. See Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987). "If a plaintiff sustains the initial burden, a presumption of retaliation arises. In turn, under the second step of the burden-shifting analysis, the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. Finally, as for the third step, once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) (internal quotation marks and citations omitted).

Defendants argue that plaintiff has failed to satisfy the third (adverse employment action) and fourth (causation) prongs of his prima facie retaliation case. "A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Id. (internal quotation marks, citation and alterations omitted). The Court finds that the agency's decision to place Ghaly on paid administrative leave while investigating evidence of his misconduct was not an adverse employment action, as it was consistent with preexisting USDA disciplinary procedures. "[A]n employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006). However, there is at least a genuine question of material fact as to whether the employer's decision to transfer plaintiff to daytime shifts at the cargo unit constituted an adverse employment action, as Ghaly alleges that his job duties were thereby drastically reduced and that he lost his ability to collect nighttime differential pay. See Morris v. Lindau, 196 F.3d 102, 113 (2d Cir. 1999) ("To constitute an adverse employment action, a transfer must be accompanied by a negative change in the terms and conditions of employment.") (citing Dahm v. Flynn, 60 F.3d 253, 257 (7th Cir. 1994) (transfer involving a dramatic downward shift in duties can rise to the level of an adverse employment action); Fyfe v. Curlee, 902 F.2d 401, 405 (5th Cir. 1990) (transfer from productive position to menial make-work one is an adverse employment action)).

Dispositively, however, even assuming *arguendo* that Ghaly's paid administrative

suspension and his subsequent transfer to the cargo area both constituted adverse employment actions, plaintiff has not made out a prima facie case of retaliation because the record contains no evidence at all of a causal connection between his discrimination complaints to EEOC and either of those events, as his complaint alleges. "[C]ausation can be established by showing that the retaliatory action was close in time to the protected activity; that other similarly situated employees were treated differently; or with direct proof of retaliatory animus." Reed, 95 F.3d at 1178 (citing Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990); DeCintio v. Westchester Cnty. Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987)).

Timing does not support causation in this case. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511 (2001) (quoting O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001)). More specifically, when assessing causal connections based on temporal relationship, "[t]hree months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation." Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005), and "[s]ix months between protected activity and discharge is well beyond the time frame for inferring retaliatory causation." Id.; see Jimenez v. City of New York, 605 F. Supp. 2d 485, 528 (S.D.N.Y 2009) (noting that, "[i]n general, when more than three months have passed between a protected activity and an alleged retaliatory response, the Second Circuit has deemed the evidence insufficient to raise an issue of fact concerning causation."). Ghaly filed his first EEOC complaint approximately nine months before he was placed on paid administrative leave and filed his next complaint approximately

one year before his transfer to the cargo area.

Similarly, there is no evidence of disparate treatment either with respect to Ghaly's placement on leave or the treatment by his employer upon his return. Nine other employees were also suspended with pay in connection with the OIG investigation in which Ghaly was implicated, and Ghaly was the only one who was not subsequently fired or suspended for an additional period without pay. Moreover, as the EEOC noted, Ghaly's boss gave a reasonable explanation for transferring Ghaly to the cargo area, citing concerns about his tardiness and attendance and the need to supervise him more closely. Finally, plaintiff's conclusory assertions aside, there is absolutely no direct evidence of retaliatory intent in the record. Consequently, plaintiff's retaliation claim fails at the first step of the McDonnell Douglas analysis.

And, even if Ghaly could make the requisite prima facie showing of retaliation, his claim would still fail. Defendants have articulated legitimate, nondiscriminatory reasons for the challenged employment actions; plaintiff and others were placed on leave after evidence giving rise to suspicion of time and attendance abuses came to light, and upon plaintiff's return to the workplace, his superiors deemed it appropriate to monitor his job performance more closely. It is reasonable for an employer to increase oversight of an employee who has been formally warned to toe the line on punctuality and attendance. Ultimately, plaintiff has not provided any basis for the Court to infer that the employer's reasons for its actions were pretextual, nor has he offered any evidence to show that retaliation was a "substantial reason for the [alleged] adverse employment action[s]." Jute, 420 F.3d at 173. There being no material fact in dispute, summary judgment for the agency defendant is appropriate.

## CONCLUSION

For all of the foregoing reasons, defendants' motion to dismiss plaintiff's complaint pursuant to Rule 37 is denied, but defendants' Rule 56 motion for summary judgment on plaintiff's claims is granted. Plaintiff's claims are dismissed in their entirety with prejudice.

The Clerk is directed to enter judgment for defendants and to close this case.

SO ORDERED.

Dated:        Brooklyn, New York
                 September 9, 2010

s/Eric Vitaliano
_____
ERIC N. VITALIANO
United States District Judge
